# CV 13     4423

FILED
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

2013 AUG -6  AM II: 19

------------------------------------------------------------------------X

LAWRENCE WILLIAMS

           Plaintiff,

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

Index No.:

       -against-

THE CITY OF NEW YORK, DETECTIVE BRIAN J.
HARRINGTON (NYPD) SHIELD #213,
DETECTIVE RENEE MURRIEL (NYPD)
(RETIRED), CAPTAIN TIMOTHY LYON
(NYPD) TAX #896505, LIEUTENANT DANIEL
DIVERS (NYPD) TAX #901471, AND OFFICERS
JOHN DOE #1-10 (THE NAME JOHN DOE BEING
FICTICIOUS, AS THE TRUE NAME(S) IS/ARE
PRESENTLY UNKNOWN),

**COMPLAINT**

**JURY TRIAL
DEMANDED**

*JOHNSON*

           Defendant.

------------------------------------------------------------------------X

The Plaintiff, complaining by his attorney(s), THE LAW OFFICE OF JEFFREY

CHABROWE, P.C., respectfully shows this Court and alleges:

## INTRODUCTION

1.  This is a civil rights action to vindicate the rights of Plaintiff Lawrence Williams, a
    married father of three who was wrongfully incarcerated for more than two years after
    members of the New York City Police Department ("NYPD") knowingly forwarded
    false, unreliable and otherwise misleading evidence to the Kings County District
    Attorney's office in order to secure his conviction.

2.  The wrongful conviction of Lawrence Williams was vacated October 26, 2012, at the
    urging of Kings County prosecutor John P. O'Mara, Chief of the Brooklyn District
    Attorney's Conviction Integrity Unit, who stated on the record after a thorough

1

investigation that *he did not believe Lawrence Williams was guilty* of the crimes for which he was charged.

3. Upon information and belief, when Supreme Court Justice Michael Gary vacated the Plaintiff's conviction, he opined, "The justice system should apologize to Mr. Williams."

4. The individual Defendants in this case are now being sued for their respective roles in the Plaintiff's unjust conviction.

5. The City of New York is being sued for failing to properly train, supervise, and/or discipline New York City police officers, and for continuing to tolerate and defend a widely publicized departmental culture of willful indifference toward the rights of citizens.

## JURISDICTION

6. Jurisdiction is founded upon the existence of a Federal Question.

7. This is an action to redress the deprivation under color of statute, ordinance, regulation, custom, or usage of rights, privileges, and immunities secured to the Plaintiff by the Fourth and Fourteenth Amendments to the Constitution of the United States pursuant to 42 U.S.C. Section 1983 and arising under the law and statutes of the State of New York.

8. Jurisdiction is founded upon 28 U.S.C. Sections 1331, 1343(3) and 1343(4), this being an action authorized by law to redress the deprivation under the color of law, statute, ordinance, regulation, custom and usage of rights, privileges and immunities secured to Plaintiffs by the Fourth and Fourteenth Amendments to the Constitution of the United States.

2

## VENUE

9.  Venue lies in this District pursuant to 28 U.S.C.A. Section 1391(b) (2) since the events giving rise to the claim occurred in the Eastern District.

## PARTIES

10. At all times relevant and hereinafter mentioned, Plaintiff LAWRENCE WILLIAMS was a resident of Staten Island in the City of New York.

11. Upon information and belief, at all times hereinafter mentioned, the Defendant, CITY OF NEW YORK was and still is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York, and that at all times relevant all Defendant officers were acting for, upon, and in furtherance of the business of their employer and within the scope of their employment.

12. Upon information and belief, at all times hereinafter mentioned, the Defendant, CITY OF NEW YORK, its agents, servants, and employees, operated, maintained and controlled the NEW YORK CITY POLICE DEPARTMENT, including all the police officers thereof.

13. Upon information and belief, at all times hereinafter mentioned, Defendant DETECTIVES BRIAN J. HARRINGTON, and RENEE MURIELL, their commanding officers Defendant FORMER SERGEANT (NOW LIEUTENANT) DANIEL DIVERS and Defendant FORMER LIEUTENANT (NOW CAPTAIN) TIMOTHY LYON, and OFFICER(S) JOHN DOE #1-10 were employed by the Defendant CITY OF NEW YORK, as member(s) of its police department.

14. The NEW YORK CITY POLICE DEPARTMENT is a local governmental agency, duly formed and operating under and by virtue of the Laws and Constitution of the State of New York and the POLICE CHIEF OF THE NEW YORK CITY POLICE DEPARTMENT is responsible for the policies, practices, and customs of the NEW YORK CITY POLICE DEPARTMENT as well as the hiring, screening, training, supervising, controlling and disciplining of its police officers and civilian employees, and is the final decision maker for that agency.

15. This action arises under the United States Constitution, particularly under provisions of the Fourth and Fourteenth Amendments of the Constitution of the United States, and under federal law, particularly the Civil Rights Act, Title 42 of the United States Code, Section 1983, and the rights guaranteed by the Constitution and laws of the State of New York.

16. Individual Defendants in this action are being sued in both their individual and official capacities.

## STATEMENT OF FACTS

### -The Crime-

17. On April 21, 2008, at approximately 10:20 pm, 21 year old Alberto Ortiz entered an apartment building at 1945 West 23rd Street, Brooklyn, NY with his friend Rafael Rivera, en route to Rivera's 8th floor apartment.

18. As existing surveillance video shows, the two were followed onto the elevator by two young African American men ("the two men").

19. Ortiz and Rivera had little, if any, interaction with the two men and remained essentially oblivious of them.

20. One of the men (Man #1) wore his hair in braids under a white doo-rag and fitted black baseball cap.

21. Man #1 was approximately 5'10, and had a very slim build.

22. The second man (Man #2) wore a dark baseball cap, dark clothes, and stood at approximately 5'5.

23. Man #2 was much heavier than Man #1.

24. Man #2 was also carrying a small white shopping bag upon entry, which he subsequently handed to Man #1.

25. Once aboard the elevator, Man #1 allegedly asked Ortiz and Rivera if they knew where he might obtain some marijuana.

26. Without paying much attention, Ortiz shook his head no, though test results taken two hours later would reveal that Ortiz had THC (the primary psychoactive active ingredient in marijuana) in his system.

27. When the elevator reached the 8th floor, Ortiz and Rivera exited.

28. The two men followed behind Ortiz and Rivera, who remained apparently unconcerned.

29. Ortiz and Rivera then proceeded to enter Rivera's eighth floor apartment and close the door.

30. Minutes later, 15 year old Aida Rivera, Rafael Rivera's younger sister, exited the Rivera apartment and entered the hallway to meet two friends, Rasheem Moses (age 13) and Jesus Gonzalez (age 15).

31. The group chatted for the next several minutes and they were the only ones present in the hallway for that period.

32. The two men were nowhere in sight.

33. Shortly thereafter, as the teens continued to chat, Ortiz exited the apartment alone, heading back down the hall in the direction of the elevator.

34. Suddenly, without warning, the two men descended upon Ortiz from a nearby stairwell.

35. Man #1 shoved a gun in Ortiz's face, grabbed at a neck chain Ortiz was wearing, and ordered Ortiz to hand over his valuables; Man #2 stood watch over the three teenagers, apparently seeking to discourage any attempts at intervention.

36. Without thinking, Ortiz reflexively tried to swat the gun away from his face, enraging Man #1, who upon information and belief, began yelling, "Stop playing games!" and shoving Ortiz back with his free hand, the gun pointed squarely at Ortiz's face.

37. Ortiz began screaming over his shoulder for help from his friend Rafael Rivera who remained back in the apartment.

38. Ortiz struggled to keep one eye on the gun as Man #1 continued to shove Ortiz's right shoulder and arm, jolting Ortiz's head and torso to the right, with increasing aggression.

39. Amidst this chaos, no one in the hallway was able to get a good look at the faces of the two men.

40. As Ortiz neared the apartment door, one of Man #1's pushes spun Ortiz completely around; Man #1 then pounded Ortiz on the back of the head with the butt of his gun, dropping Ortiz to the ground.

41. Once Ortiz was down, the tall man raised his gun and fired a single bullet into the upper right portion of Ortiz's back.

42. As Ortiz collapsed, the two men made their escape through a nearby stairwell—dropping the small white shopping bag as they fled.

### -The Initial Investigation-

43. Defendant Detective Brian J. Harrington took charge of the investigation, assisted by, among others, Defendant Detective Renee Muriell; both arrived within 30 minutes of the shooting.

44. It was immediately apparent that identifying suspects would be extremely difficult.

45. Ortiz had been taken to the hospital, his medical condition was unknown, and he was not available to be interviewed.

46. The white shopping bag dropped by the men was checked for fingerprints, but yielded no results; a t-shirt found inside the bag was sent for DNA analysis, but the results would not be readily available.

47. Video from security cameras was obtained showing the two men in various areas of the building, but the quality was poor, they were both wearing baseball caps, and the angle of the cameras from above, made observation of any facial features impossible.

48. There was no video of the actual robbery.

49. Defendant Detective Renee Muriell interviewed Aida Rivera almost immediately upon her arrival.

50. Notably, Aida's hallway companions, Rasheem Moses and Jesus Gonzalez, who viewed the incident from the same vantage point as Aida, admitted they had not been able to get a good look at either of the two men.

51. Nevertheless, Aida swore that she had seen the gunman, and described him as wearing a "black ski cap" and having a "crew cut."

52. It remains unclear how Aida was able to determine the shooter had a crew cut if his hair was concealed under a ski cap.

53. Detective Muriell proceeded to take both Aida and Rafael Rivera back to the 60th precinct to view photographs of potential suspects.

54. Aida testified at trial that she identified one of the two men in this photo array although her account was contradicted by Defendants Muriell and Harrington who have steadfastly maintained that neither Aida nor Rafael were able to identify anyone.

55. Notably, Defendant Muriell did not preserve the array of photographs, giving rise to an inference that an over-eager Aida made a selection which was plainly incorrect, and police were seeking to conceal that fact in order to retain her as a witness.

56. Upon information and belief, Rafael Rivera, who rode the elevator with Ortiz and the two men, was not asked to participate in any further aspect of the case.

57. At approximately 2:00AM the next morning, Defendant Detective Harrington and Defendant Lieutenant Lyon (who has since been promoted to Captain) went to Lutheran Hospital to meet with Alberto Ortiz.

58. According to paperwork generated by Harrington, and approved by Lyon, Ortiz declined to look at a photo array at that time, saying he was not feeling up to it; upon information and belief, Ortiz has never corroborated this account.

59. At a subsequent hearing, Harrington would not confirm or deny having had photos ready to show Ortiz at the hospital—and as with the array allegedly prepared by Defendant

Muriell, no such array was ever recorded or preserved.

### -The Dubious Naming of Lawrence Williams as Suspect-

60. According to paperwork generated by Defendant Harrington, and approved by Defendant Lyon, Alberto Ortiz was interviewed at the 60th precinct on April 24, 2008, three days after the shooting.

61. During this meeting, Ortiz allegedly told Harrington that "people in the neighborhood" had identified someone named "Lawrence Williams" as one of the perpetrators who shot and otherwise attempted to rob him.

62. Alberto Ortiz has consistently maintained that he NEVER gave Defendant Harrington the name Lawrence Williams, and has no knowledge of anyone having given the name to police.

63. Defendant Harrington, for his part, has remained equivocal at best regarding where and how he obtained the name Lawrence Williams.

64. At an April 2009 hearing regarding the Plaintiff's identification, Harrington testified, consistent with his paperwork, that he had obtained the name from Ortiz, who had gotten it from someone in the neighborhood.

65. During the 2010 trial of the Plaintiff, Harrington testified somewhat cryptically, "From what I remember [Ortiz] came in and gave me a nickname.  I asked them to call somebody that was the same person who already told me Lawrence Williams, so I wanted to confer with her, that's when I got Lawrence Williams."

66. At trial, when Defense counsel pressed Harrington about whether he had ever followed up with the reported "neighborhood" person(s) who allegedly provided the name Lawrence Williams, Harrington conceded he had not.

67. At a subsequent interview with A.D.A. John P. O'Mara, Harrington admitted that his testimony relative to having gotten the Plaintiff's name from Ortiz was "incorrect," and that he believed the name was actually provided by Ortiz's aunt, Angelica Torres.

68. When investigators followed up with Ms. Torres, she denied providing any name to police, or possessing or having heard any information regarding the name or identity of the shooter.

## -The Alleged Photo Identification of the Plaintiff-

69. After obtaining the name of the Plaintiff, through whatever means, Defendant Harrington allegedly generated a computerized photo array of individuals named Lawrence Williams.

70. According to Harrington, the system produced some 64 pictures of people named "Lawrence Williams," and on August 24, 2009, Ortiz picked the Plaintiff's picture from that array.

71. Once again, no independent verification or record of this alleged photo array or identification was ever preserved or recorded.

72. Indeed, at trial Ortiz testified that he never identified Lawrence Williams in a photograph *at any point in the investigation,* giving rise to an inference that no such photo array ever existed.

73. Notwithstanding, following what Harrington falsely alleged as Ortiz's photo identification of the Plaintiff, Harrington issued a system-wide advisory calling for the Plaintiff's arrest.

74. Harrington further noted the existence of an active bench warrant for Lawrence Williams from the Bronx, pursuant to a motor vehicle case in which the Plaintiff had missed a court appearance.

75. Thereafter, Harrington launched an effort to locate and apprehend the Plaintiff.

**-The Arrest-**

76. On May 20, 2008, at approximately 4:00 AM, members of the NYPD's Brooklyn South Apprehension Team assembled outside the residence of Plaintiff's friend, in Staten Island, NY, where police suspected the Plaintiff had been an overnight guest.

77. Officers proceeded to break through the locked door of the residence and enter with guns drawn, absent any permission or authority.

78. One of the officers pointed his gun directly at the dog of Plaintiff's friend, and ordered that it be placed in the basement, or it would be shot.

79. Plaintiff's friend complied; thereafter, the officers proceeded to ransack the house, rifling through drawers and cupboards, and flipping over mattresses.

80. No evidence of the robbery or other contraband was recovered.

81. The officers proceeded to drag a terrified and confused Lawrence Williams out of the home in handcuffs.

82. Officers refused to tell Lawrence Williams why he was being arrested, despite their knowledge of the active warrant; nor did they ever Mirandize him.

83. After arriving at the precinct, Lawrence Williams was forced to endure a humiliating strip search that involved stripping naked, spreading the cheeks of his buttocks, bending over, squatting, and coughing so officers could see up his rectum; no contraband was ever recovered.

84. Shortly thereafter, Defendant Harrington approached Lawrence Williams, demanding answers to questions about a robbery in Brooklyn.

85. Terrified, Mr. Williams acknowledged the existence of his open motor vehicles case for which he had counsel, but stated repeatedly and unequivocally that he knew nothing about any robbery in Brooklyn.

86. Nevertheless, Defendant Harrington insisted that he "knew" Mr. Williams had been involved, declaring, in sum and substance, "I am going to make my career off of you."

87. Defendant Harrington proceeded to order Lawrence Williams to participate in a line-up.

88. Mr. Williams then explicitly invoked his right to counsel by requesting that his attorney be present.

89. Harrington abjectly refused, proceeding with the line-up without apprising Mr. Williams's counsel of the situation, or otherwise affording a reasonable opportunity for Plaintiff's counsel to appear.

90. Notably, the bench warrant under which Lawrence Williams was arrested specifically mandated that arresting officers "must without unnecessary delay bring the Defendant before [the issuing] court" in Bronx County.

91. Nevertheless, according to Harrington's paperwork, the line-up was not conducted until 5:40PM, more than 12 hours after the Plaintiff was arrested; plainly, the Defendant

officers had no intention of allowing any court, defense attorney, or constitutional

mandate come between them and their intended scheme for Lawrence Williams.

### -The Line-up-

92. The Defendant officers engaged in a series of significant departures from customary line-up procedure.

93. While it is widely recommended that multiple witnesses who will be viewing the same line-up have limited opportunities to speak before, during, or after the process, Defendant Harrington elected to *personally* drive Ortiz and Rivera together, in the same car, to view the lineup.

94. Once at the precinct, Defendant Harrington placed Ortiz and Rivera together, in the same room, unsupervised, where Harrington testified the two remained for an additional 20-30 minutes as he continued to float "back and forth" between their room and the viewing room, pending his final orchestration of the line-up.

95. Notably, according to Harrington's paperwork, Ortiz and Rivera were kept in *separate* rooms once they arrived at the precinct; Harrington contradicted this account at trial, as did both Ortiz and Rivera who testified unequivocally that they had been placed in the *same* room.

96. Defendant Harrington took Ortiz and Rivera, one by one, to view the line-up, with Aida going first.

97. Police elected not to take any photographs depicting the angle from which the witnesses viewed the line-up, or giving any indication as to witness' ability to distinguish the features of those being viewed.

98. Upon information and belief, however, on the day of the line-up, Lawrence Williams wore his hair in distinctive braids, as did the alleged shooter, while some or all of the remaining participants did not.

99. While fine mesh surgical caps were placed over the hair of those in the line-up to provide some pretext of uniformity, the caps were translucent enough to reveal the general hairstyles of the participants.

100. Moreover, on the day of the line-up, the braids of Mr. Williams stretched down to the base of his neck, which caused clumping that set him apart from other unbraided participants.

101. Worst of all, unlike the other participants in the line-up, Mr. Williams was forced to remain visibly handcuffed throughout.

102. Once in the viewing room, Aida testified that Defendant Harrington suggestively instructed her to "point out the person who had the gun."

103. It is against this corrupt and deplorable backdrop that both Aida Rivera and Alberto Ortiz identified the person sitting in position #4, Lawrence Williams, as the shooter.

**-Prosecution-**

104. Relying on manipulated identifications and fraudulent evidence supplied by the Defendant police, a Grand Jury indicted Lawrence Williams on charges that included Attempted Second Degree Murder and Attempted First Degree Robbery.

105. On or about September 12, 2008, as acknowledged in police reports approved by Defendant Divers, the T-shirt recovered from the suspects' abandoned shopping bag was found to contain DNA matching a "Taevon Hutchinson."

106. Notably, some five months passed between the robbery and Defendants' procurement of the DNA results, and Defendants made no effort to expedite that process.

107. Defendant Harrington issued a half-hearted advisory requesting notification if Hutchinson was detained by police, but in contrast to his zealous pursuit of Lawrence Williams, Harrington made no real effort to have him arrested.

108. The subject of the Taevon Hutchinson DNA match was raised during the Plaintiff's March 2010 trial, but Harrington testified, and the Prosecution argued, that Hutchinson had simply been the second perpetrator (i.e., "Man #2), and Lawrence Williams had been the shooter.

109. Yet as Assistant District Attorney John O'Mara would later attest, both Lawrence Williams and Taevon Hutchinson stand at approximately 5'10; and both the surveillance video and witness accounts establish that Man #2 was substantially shorter than the shooter.

110. Thus, Lawrence Williams and Taevon Hutchinson could not possibly have committed the crime together, and Defendant Harrington knew it.

111. Harrington also testified that he had tried, but been unable to locate Taevon Hutchinson.

112. An Internal Affairs Bureau investigation would later reveal that Taevon Hutchinson was, in fact, arrested in May of 2009, some 10 months before the trial of Lawrence Williams, and the 60th Precinct Detective squad was contemporaneously notified, per Harrington's request.

113. Nevertheless, neither Harrington, Muriell, Defendant supervisors Lyon or Divers, or anyone else connected to the investigation ever bothered to follow-up.

114. Harrington would later tell A.D.A. O'Mara that he had no knowledge concerning the arrest of Hutchinson or any notification related to the same.

115. On March 8, 2010, Lawrence Williams was convicted of Assault and Attempted Robbery, and subsequently sentenced to 10 years in prison.

### -POST-CONVICTION-

116. In the two years that followed the Plaintiff's wrongful conviction, Lawrence Williams was forced to endure an unthinkable slew of mental, psychological and physical injuries.

117. Among other things, the Plaintiff was separated from his wife, children, friends, and extended family; he was subjected to prison beat downs; he was prevented from attending his mother's funeral, or spending her last days with her; he was the victim of rape; and he lived in a state of constant fear and anxiety.

118. Despite this, Lawrence Williams and his supporters continued to maintain his innocence and fight for his release.

119. As part of these efforts, the family hired a private investigator who sought contact with Taevon Hutchinson while he was incarcerated at Rikers Island on another offense.

120. Hutchinson ultimately confessed, both verbally and in writing, that he had been the one who shot and attempted to rob Alberto Ortiz.

121. Shortly thereafter, the Kings County Conviction Integrity Unit was notified and A.D.A O'Mara took up the case.

122. Following a thorough investigation. A.D.A. O'Mara wrote an Affirmation in Support of the Plaintiff's application to vacate his conviction, acknowledging unequivocally that "Lawrence Williams is not guilty in this case."

16

123. On October 26, 2012, Supreme Court Justice Michael Gary granted A.D.A. O'Mara's motion to vacate the Plaintiff's conviction, stating, "The justice system should apologize to Mr. Williams."

124. Unfortunately, despite his release after some 2 ½ years in prison, Lawrence Williams continues to suffer from the numerous harms inflicted on him by the Defendants.

125. Among other things, Mr. Lawrence has flashbacks of his traumatic experiences in prison that make it difficult for him to rejoin society productively; he has struggled to fully connect with friends and family, and fears he never will; he becomes anxious in the presence of crowds and particularly police; he is subject to panic attacks when he tries to utilize public transportation or enters other enclosed spaces; and to this day, various officers apparently familiar with his case continue to taunt, harass, and otherwise intimidate him.

## AS AND FOR THE FIRST CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF LAWRENCE WILLIAMS AGAINST ALL DEFENDANTS

### Violation of Constitutional Rights Under Color of State Law
### —Malicious Prosecution—

126. Plaintiffs incorporate by reference and reallege each and every allegation stated in Paragraphs 1 through 125.

127. The Fourth Amendment of the United States Constitution protects citizens from overzealous and malicious prosecution by government officials without probable cause.

128. Lawrence Williams was prosecuted, without probable cause, relative to the April 21, 2008 attempted robbery as set forth herein.

129. Said charges resulted in a loss of liberty for Mr. Williams, as he was incarcerated for over two years as a result of the aforedescribed false and improper charges, and incurred substantial financial and emotional damages as a direct result.

130. Mr. Williams's criminal proceeding was terminated in favor of Mr. Williams, as the charges in question were dismissed outright.

131. Defendants' actions were motivated by bad faith, malice, and/or deliberate indifference to the rights of Lawrence Williams.

132. This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

133. As a direct and proximate result of the unconstitutional acts described above, Plaintiff Lawrence Williams has been irreparably injured.

## AS AND FOR THE SECOND CAUSE OF ACTION
## ON BEHALF OF THE PALINTIFF AGAINST ALL DEFENDANTS

### Violation of Constitutional Rights Under Color of State Law
### -Denial of Constitutional Right to Fair Trial Due to Fabrication of Evidence-

134. Plaintiff's incorporate by reference and reallege each and every allegation stated in Paragraphs 1 through 133.

135. Defendants created false evidence against Plaintiff Lawrence Williams.

136. Defendants forwarded false evidence and false information to prosecutors in the Kings County District Attorney's office.

137. Defendants misled the grand jury, the judge and the prosecutors by creating false evidence against Plaintiff Lawrence Williams and thereafter providing false testimony throughout the criminal proceedings.

138. In creating false evidence against Plaintiff Lawrence Williams, in forwarding false evidence and information to prosecutors, and in providing false and misleading testimony, Defendants violated Plaintiff's constitutional right to a fair trial under the Due Process Clause of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

139. This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

140. As a direct and proximate result of the unconstitutional acts described above, Plaintiff Lawrence Williams has been irreparably injured.

### AS AND FOR THE THIRD CAUSE OF ACTION
### ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS

**Violation of Constitutional Rights Under Color of State Law**
**-Conspiracy to Violate Plaintiff's Civil Rights-**

141. Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 140.

142. Defendant officers acting under color of state law in both their individual capacities and as agents for the City of New York, conspired together, reached a mutual understanding, and acted in concert to undertake a course of conduct violative of Plaintiffs' civil rights by:

    a. Agreeing to deliberately and maliciously fabricate evidence against the Plaintiff;

    b. Agreeing to contrive false charges against the Plaintiff; and

19

    c.  Denying the Plaintiff his Sixth Amendment Right to Counsel, as

       aforedescribed.

143. This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983,

given that said actions were undertaken under color of state law.

144. Defendants' actions were motivated by bad faith, malice, and/or deliberate indifference

to the rights of Mr. Williams.

145. As a direct and proximate result of the unconstitutional acts described above, the

Plaintiff has been irreparably injured.

## AS AND FOR THE FOURTH CAUSE OF ACTION
## ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS

### Violation of Constitutional Rights Under Color of State Law
### -Failure to Intercede-

146. Plaintiff incorporates by reference and realleges each and every allegation stated in

Paragraphs 1 through 145.

147. In creating false evidence against Plaintiff Lawrence Williams, in forwarding false

evidence and information to prosecutors, and in providing false and misleading

testimony, Defendants violated Plaintiff's constitutional right to a fair trial under the Due

Process Clause of the Fifth and Fourteenth Amendments of the United States

Constitution.

148. The actions of Defendants detailed above violated the Plaintiff's rights under the United

States Constitution.  It is widely recognized that all law enforcement officials have an

affirmative duty to intervene to protect the clearly established constitutional rights of

citizens from infringement by other law enforcement officers in their presence.

149. At all times relevant herein, the right to be free from deprivations of liberty interests caused by unjustifiable criminal charges and procedures were clearly established constitutional rights that a reasonable person would have known.

150. Defendants' actions were motivated by bad faith and malice, and/or deliberate indifference to the rights of Lawrence Williams.

151. This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

152. As a direct and proximate result of the unconstitutional acts described above, Plaintiff Lawrence Williams has been irreparably injured.

## AS AND FOR THE FIFTH CAUSE OF ACTION
## ON BEHALF OF THE PLAINTIFF AGAINST DEFENDANT CITY OF NEW YORK

### Violation of Constitutional Rights Under Color of State Law
### -Implementation of Municipal Policies, Practices, and Customs that Directly Violate Constitutional Rights, Failure to Implement Municipal Policies to Avoid Constitutional Deprivations and Failure to Train and Supervise Employees Under Color of State Law-

153. Plaintiff incorporates by reference and reallege each and every allegation stated in Paragraphs 1 through 152.

154. Upon information and belief, Defendants City of New York, Lyon, Divers, and Doe #1-10 who were supervisors and final decision makers, as a matter of policy, practice, and custom, have acted with a callous, reckless and deliberate indifference to the Plaintiff's constitutional rights and laws of the United States, in that they failed to adequately discipline, train, supervise or otherwise direct police officers concerning the rights of citizens, allowed or encouraged employees to fabricate evidence against the Plaintiff, allowed or encouraged failures to disclose exculpatory evidence, allowed or encouraged

21

improper line-up procedures, allowed or encouraged denial of the Plaintiff's Sixth

Amendment right to counsel, allowed or encouraged plainly inadequate procedures for

conducting and preserving photo arrays that were ripe for manipulation and corruption,

allowed or encouraged unduly suggestive investigatory techniques and/or elicited or

vouched for false or otherwise unreliable statements from witnesses, allowed or

encouraged the forwarding of false or otherwise unreliable evidence to prosecutors in

order to secure the Plaintiff's indictment and conviction, allowed or encouraged officers

to testify falsely, and allowed or encouraged failures to  investigate further when

evidence plainly indicated a suspect other than the Plaintiff was actually guilty.

155.  In the alternative, and upon information and belief, Defendants instituted policies

addressing the topics listed above, but through a culture of gross negligence, carelessness,

and malice, demonstrated a deliberate and willful indifference to the constitutional rights

of the Plaintiff.

156. Upon information and belief, in 2011, Kings County District Attorney Charles Hynes

created the Conviction Integrity Unit in response to an ever-increasing number of

wrongful convictions.

157. Upon information and belief, in or about July of 2013, the Kings County District

Attorney's efforts substantially expanded, as the office announced the formation of an

unprecedented panel of former prosecutors, professors, and retired judges to review as

many as 50 convictions involving former Kings County detective, Louis Scarella, who is

alleged to have regularly sought false statements from witnesses, and whose work

appears to have sent an array of innocent citizens to prison.

158.  Upon information and belief, another former Kings County detective, Michael Race, whose work has also been linked to the conviction of innocents, has been quoted in press accounts as stating that of the 750 murder investigations he ran, only one was "done the correct way, A to Z."

159. The nature, regularity, and scale of such revelations, and the extraordinary efforts being undertaken in response to a highly publicized slew of wrongful convictions, gives rise to an inference of systemic incompetence and corruption on the part of the New York City Police Department, and in particular, those working in Kings County, as such a legacy of injustices cannot plausibly be laid at the feet of a few rogue officers.

160. Defendant(s) also, upon information and belief, demonstrated deliberate indifference to the rights of those arrested in the City of New York by failing to adequately hire, screen, train, and supervise officers in Kings County and the 60th Precinct.

161.  The policies, procedures, customs and practices of the above-referenced Defendants violated the Constitutional rights of the Plaintiff under the Fourth, Sixth, and Fourteenth Amendments of the United States Constitution.

162.  This conduct on the part of Defendants also represents a violation of 42 U.S.C § 1983, given that said actions were undertaken under color of state law.

163. None of the Defendants named herein have been disciplined in any way for their actions relative to the Plaintiff; in fact, Defendants Lyon and Divers have both been promoted to the ranks of Captain and Lieutenant, respectively

164. As a direct and proximate result of the unconstitutional acts described above, the Plaintiff has been irreparably injured.

## DEMAND FOR PUNITIVE DAMAGES

165. The actions of Defendants described herein were extreme and outrageous, and shock the conscience of a reasonable person. Consequently, an award of punitive damages is appropriate to punish the Defendants. The Plaintiffs do not seek punitive damages against the City of New York.

## DEMAND FOR TRIAL BY JURY

166. The Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lawrence Williams requests that this Honorable Court grant him the following relief:

A. A judgment against Defendants Harrington, Muriell, Lyon, Divers and Doe(s) for compensatory and punitive damages in an amount to be determined by a properly charged jury;

B. A judgment against Defendant City of New York for compensatory damages in an amount to be determined by a properly charged jury;

C. A monetary award for attorneys fees and costs of this action, pursuant to 42 U.S.C. § 1988;

D. Any other relief this Court finds to be just, proper, and equitable.

Dated:  New York, New York
        August 6, 2013

Respectfully Submitted By:

The Law Office of Jeffrey Chabrowe, P.C.
By:

Andrew L. Hoffman, Of Counsel
EDNY Bar Code Number: AH9502
261 Madison Avenue, 12 Floor
New York, New York 10016
T:      (212) 736-3935
E: ahoffman@andrewhoffmanlaw.com